

# PAVAN PARIKH
# HAMILTON COUNTY CLERK OF COURTS

## COMMON PLEAS DIVISION

ELECTRONICALLY FILED
May 20, 2022 01:12 PM
PAVAN PARIKH
Clerk of Courts
Hamilton County, Ohio
CONFIRMATION 1191909

SYMPLR SOFTWARE INC AS A
SUCCESSOR IN INTEREST TO
vs.
STEVE GRYGLAS

A 2201804

FILING TYPE:  INITIAL FILING (OUT OF COUNTY) WITH JURY
DEMAND

PAGES FILED: 56

EFR200

| | |
|---|---|
| **SYMPLR SOFTWARE, INC. as a successor in interest to HALO COMMUNICATIONS, INC.,** 315 Capitol Street, Suite 100 Houston, Texas, 77002 **PLAINTIFF,** **v.** **STEVE GRYGLAS,** 308 North Addison Avenue Elmhurst, Illinois, 60126 **DEFENDANT.** | **Case No. _____** **Judge _____** |

## COMPLAINT

Plaintiff Symplr Software, Inc. ("Symplr"), as a successor in interest to Halo Communications, Inc. ("Halo") (collectively, "Plaintiff"), alleges as follows:

## NATURE OF THE ACTION

1.    This action arises from the evident and egregious scheme of Defendant Steve Gryglas ("Gryglas") to solicit Plaintiff's employees for the benefit of his new employer, PatientIQ—all in direct and explicit violation of Gryglas' written Noncompetition, Confidentiality and Intellectual Property Agreement ("Noncompetition Agreement") with Plaintiff. Gryglas, who began working for Halo in or about October 2019, served as Halo's Vice President of National Accounts and enjoyed access to Plaintiff's highly confidential information, including but not limited to details of Plaintiff's business and marketing strategies; company initiatives; customer information and lists; employee contact information; and the amount and types of compensation and benefits its employees received.

2.     Shortly after becoming employed by Plaintiff, Gryglas entered into a written Noncompetition Agreement with Plaintiff in which, among other things, Gryglas agreed (a) during employment and for one year after termination, not to engage in or be employed by any entity that competes with Plaintiff; and, (b) during employment and for one year after, not to solicit or hire any of Plaintiff's employees, except with Plaintiff's prior written consent. A true and correct copy of the Noncompetition Agreement is attached hereto as Exhibit A.

3.     Despite Gryglas' express contractual obligations, Gryglas abruptly resigned from Plaintiff's employ on October 29, 2021, and immediately joined PatientIQ—a direct competitor of Plaintiff.

4.     In further violation of his Noncompetition Agreement, Plaintiff has learned that, since Gryglas' departure, Gryglas has solicited numerous of Plaintiff's employees in an attempt to divert business away from Plaintiff to his new employer, PatientIQ.

## PARTIES

5.     Plaintiff Symplr is a healthcare operations solution provider, organized under the laws of Delaware with a principal place of business in Houston, Texas, at 315 Capitol Street, Suite 100, Houston, Texas, 77002. Symplr acquired Halo on or about October 13, 2021 (the "Transaction"). Halo is a Delaware corporation organized under the laws of Delaware with a principal place of business in Cincinnati, Ohio.  Together, Symplr and Halo offer a variety of services to healthcare providers, including, but not limited to (i) aggregating market feedback to drive positive patient outcomes; (ii) collecting data to evaluate service value and achieve organizational performance goals; (iii) providing a communication platform for providers to streamline workflows and improve patient safety; and (iv) providing systematic analysis and classification of patient incidences to produce actionable information.

2

6.      Gryglas is a former employee of Plaintiff who, upon information and belief, is a resident of the State of Illinois, and resides at 308 North Addison Avenue, Elmhurst, Illinois, 60126.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over this action because Plaintiff maintains its principal place of business in, and regularly and systematically conducts business in, Ohio.

8.      This Court is the proper venue for this action because Plaintiff is located in Hamilton County, Ohio and regularly and systematically conducts business in Hamilton County, Ohio.

9.      Venue is further proper pursuant to the agreement contained in the contract at issue in this litigation, in which Gryglas "irrevocably attorn[ed] to the exclusive jurisdiction of the courts of the County of Hamilton, State of Ohio."  (Exhibit A, p. 4.)

## FACTS

**A.      Gryglas Accepts Employment with Plaintiff.**

10.      In or about October 2019, Plaintiff offered Gryglas—and Gryglas accepted—employment with Plaintiff in its Cincinnati, Ohio location.  Gryglas' position was Vice President of National Accounts.

11.      As Vice President of National Accounts, Gryglas was responsible for aligning Plaintiff's sales, services, products and clinical teams with the goals and priorities of Plaintiff's key national accounts.

12.      In order to perform in his job, Gryglas enjoyed wide access to and routinely utilized Plaintiff's confidential information. Notably, Gryglas had access to, and was familiar with, the intricacies of Plaintiff's product and service offerings; business and marketing strategies,

3

especially those for its key national accounts; customer information and goals; and financial information.

13. In fact, Gryglas was one of six employees identified as a "Knowledge Party" in the Transaction.

14. Given Gryglas' importance to Plaintiff, Plaintiff compensated Gryglas with extraordinary sums of money. By way of example, in 2019, immediately after Gryglas was hired, Plaintiff paid him $150,000 base salary, plus $225,000 in annual variable potential, for a total on-target earning of $375,000 per year.

15. In 2021, Gryglas' last year of employment with Plaintiff, Plaintiff's total on-target earning increased to approximately $400,000.

**B.    Plaintiff Invests Significantly in Gryglas.**

16. Plaintiff invested significantly in, and paid Gryglas handsomely for, Gryglas' unique ability to cultivate, maintain and expand Plaintiff's business.

17. On or about May 4, 2020, Plaintiff and Gryglas entered into an Incentive Stock Option Award Agreement ("ISO Agreement"). A true and correct copy of the ISO Agreement is attached hereto as <u>Exhibit B</u>.

18. Pursuant to the ISO Agreement, Plaintiff agreed to grant Gryglas 220,244 incentive stock options ("Options"), with an exercise price of $0.38. Twenty-five percent (25%) of the Options would vest on November 5, 2020, with the remainder vesting monthly in 1/36 increments.

19. In consideration of the grant of Options and in order to protect Plaintiff's legitimate business interests and investment in Gryglas, Gryglas was required to execute and abide by a Noncompetition Agreement. Specifically, the ISO Agreement states:

> <u>Acceptance by Optionee; Execution of Confidentiality Agreement</u>. The grant of the Option is effective upon approval by the Board; provided, however, the Company shall have the

E-FILED 05/20/2022 01:12 PM   /   CONFIRMATION 1191909   /   A 2201804   /   COMMON PLEAS DIVISION   /   IFOJ

right to terminate the grant of the Option in the event the Optionee fails to … (b) execute a Noncompetition, Confidentiality and Intellectual Property Agreement (the "Confidentiality Agreement") with the Company. **The grant of the Option is made in consideration of the execution of the Confidentiality Agreement** and the services to be rendered by the Optionee to the Company or to a subsidiary of the Company (the "Service").

…

"Forfeiture or Buyout on Breach of Confidentiality Agreement or Separation for Cause. (a) If the Optionee breaches any provision of the Confidentiality Agreement….the entire Option (both the vested and unvested portions) shall terminate and shall not be exercisable…"

Condition of Granting Award: Execution of the Confidentiality Agreement. The **Optionee understands that, as a condition to the Company granting the rights under this Option, the Optionee must execute and deliver a Confidentiality Agreement** with the Company.

(Exhibit B ¶¶ 2, 6, 10.) (Emphasis added).

20. Thus, on November 14, 2019, and in consideration of the Options grant and Gryglas' continued employment with Plaintiff, Gryglas executed the Noncompetition Agreement, in which he agreed to certain specific provisions to protect Plaintiff's confidential information, competitive advantage, and employees.

21. In the Noncompetition Agreement, Gryglas explicitly agreed to not compete with Plaintiff during his employment and for one year after termination of that employment:

During the period of the Participant's engagement by or relationship with the Company and for the one (1) year period immediately following the termination of the Participant's engagement by or relationship with the Company for any reason, the Participant will not directly or indirectly (whether as an officer, director, stockholder, partner, proprietor, associate, representative, consultant or in any capacity whatsoever) engage in, become financially interested in, be employed by or have any business connection with any person, corporation, firm, partnership or any other entity whatsoever which competes with the Company anywhere in the world.

(Exhibit A, p. 1.)

5

22. Gryglas also agreed, pursuant to the Noncompetition Agreement, to not solicit Plaintiff's employees during his employment and for one year after termination of that employment:

> During the period of the Participant's engagement by or relationship with the Company and for the one (1) year period immediately following the termination of the Participant's engagement by or relationship with the Company, the Participant shall not solicit or hire, directly or indirectly, on the Participant's behalf or on the behalf of any other person or entity, any person employed by the Company except with the specific prior written consent of the Company.

(Exhibit A, p. 1.)

23. Gryglas further represented that his "experience, capabilities and circumstances are such that the foregoing noncompetition and nonsolicitation provisions will not prevent [him] from earning a livelihood" and "are reasonable and properly required for the adequate protection of the current and future business of the Company." (Exhibit A, p. 1.)

24. Finally, Gryglas "acknowledge[d] that a remedy at law for any breach or threatened breach of the foregoing noncompetition and nonsolicitation provisions would be inadequate and will cause immediate and irreparable harm to the Company in a manner that cannot be measured nor adequately compensated in damages." As such, "in the event of any such breach or threatened breach, and in addition to any and all other remedies that it may have at law or in equity, the Company shall be entitled to temporary, preliminary and permanent injunctive relief to restrain such breach by the Participant, and to recover all costs and expenses, including reasonable attorneys' fees, of any proceedings brought to obtain such injunctive relief." (Exhibit A, p. 1–2.)

25. The Noncompetition Agreement is expressly governed by the laws of the State of Ohio, and Gryglas agreed to "irrevocably attorn[] to the exclusive jurisdiction of the courts of the County of Hamilton, State of Ohio and the federal courts located therein." (Exhibit A, p. 4.)

E-FILED 05/20/2022 01:12 PM  /  CONFIRMATION 1191909  /  A 2201804  /  COMMON PLEAS DIVISION  /  IFOJ

**C.     Gryglas Receives Additional Significant Consideration Pursuant to the ISO Agreement.**

26.     On or about September 12, 2021, Symplr entered into a merger agreement with Halo wherein Symplr acquired Halo.

27.     As a result of the Transaction and the Options Gryglas received under the ISO Agreement, Gryglas received a total pay out of $466,261 for his Options.

**D.     Gryglas Breaches His Contractual Obligations.**

28.     On October 29, 2021, Gryglas resigned from his employment at Plaintiff.

29.     Upon his resignation, Halo Chief Financial Officer Alessio Nasini explicitly reminded Gryglas of his non-compete and non-solicit obligations pursuant to the Noncompetition Agreement, which Gryglas acknowledged.

30.     Despite acknowledging these obligations, immediately after resigning from Plaintiff, Gryglas began employment with PatientIQ, a direct competitor of Plaintiff.

31.     PatientIQ provides a wide range of services in the healthcare industry, including: (i) aggregating patient reported outcomes to identify predictors of clinical outcomes and improve patient experience; (ii) collecting patient feedback to manage online reputation and increase patient visits and revenue, (iii) providing a communication platform for providers to interact with patients; and (iv) providing analytics software to analyze trends in data and hypothesis.

32.     PatientIQ's services are comparable, if not identical, to those of Plaintiff. Specifically, PatientIQ offers an analytics platform that directly competes with many of Plaintiff's analytics offerings, as well as many education resources that compete with specific Plaintiff products.  PatientIQ further offers various patient survey and outcome tracking that Plaintiff also offers.

33.     Upon information and belief, Plaintiff has also since learned that shortly after Gryglas' resignation, Gryglas solicited at least three of Plaintiff's employees—Kendall Shadley, Bryan Beaver, and Jordan Kiphart— to leave Plaintiff's employ and to join PatientIQ.

34.     Having learned of Gryglas' improper conduct, Plaintiff took immediate measures to protect its valuable employees, clients, legitimate business interests, and confidential information, and to try to mitigate the damage that Gryglas' breaches caused.

35.     On January 25, 2022, Plaintiff, via its counsel, sent a letter to Gryglas to provide notice of Gryglas' breaches and to demand that Gryglas cease and desist from his unlawful conduct and unwind the damage they had already done, to the extent such damage could be unwound.

36.     Gryglas' counsel responded to Plaintiff's cease-and-desist letter on February 8, 2022, denying that Gryglas was working for a competitor, but did not address whether Gryglas had breached his non-solicitation obligations.

<u>COUNT ONE</u>
**BREACH OF CONTRACT**

37.     Plaintiff repeats and realleges each and every previously stated allegation of this Complaint as though fully set forth herein.

38.     The Noncompetition Agreement and the ISO Agreement that Gryglas executed constitute valid and enforceable agreements.

39.     Under the Noncompetition Agreement, Gryglas is explicitly required to "not directly or indirectly (whether as an officer, director, stockholder, partner, proprietor, associate, representative, consultant or in any capacity whatsoever) engage in, become financially interested in, be employed by or have any business connection with any person, corporation, firm, partnership or any other entity whatsoever which competes with the Company" for one year after termination of employment. (Exhibit A, p. 1.)

8

40. The Noncompetition Agreement also prohibits Gryglas from "solicit[ing] or hir[ing], directly or indirectly, on the Participant's behalf or on the behalf of any other person or entity, any person employed by the Company except with the specific prior written consent of the Company" for a year after termination. (Exhibit A, p. 1.)

41. In blatant breach of the Noncompetition Agreement, immediately after Gryglas' resignation from Plaintiff, he commenced employment with Plaintiff's direct competitor— PatientIQ.

42. Gryglas thereafter proceeded to unlawfully solicit Plaintiff's employees to leave Plaintiff's employ and join Gryglas at PatientIQ, in direct violation of Gryglas' Noncompetition Agreement.

43. Upon information and belief, Gryglas solicited at least three separate employees of Plaintiff in the short time since his resignation.

44. As a result of Gryglas' breaches of the Noncompetition Agreement, Gryglas has been unjustly enriched by receiving a payout of $466,261 for his Options, an amount which Gryglas would only have been entitled to provided he complied with his obligations under the Noncompetition Agreement.

45. As a result of Gryglas' breaches and prospective breaches, Plaintiff has suffered irreparable injury that cannot be adequately or fully remedied at law or by the assessment of damages against Gryglas and therefore seeks injunctive relief prohibiting Gryglas from providing services to or being employed by a competitor of Plaintiff including but not limited to PatientIQ, as contemplated and provided for in the Noncompetition Agreement. In addition to a remedy at equity, Plaintiff seeks declaratory relief and compensatory damages, including but not limited to

9

restitution of the amounts Plaintiff received pursuant to the ISO Agreement, punitive damages, and attorney's fees and costs.

## COUNT TWO
## UNJUST ENRICHMENT

46.     Plaintiff repeats and realleges each and every previously stated allegation of this Complaint as though fully set forth herein.

47.     Gryglas has been unjustly enriched to the detriment of Plaintiff because he knowingly retained a benefit from Plaintiff to which he was not entitled.

48.     Gryglas knowingly received a payout from Plaintiff in the amount of $466,261 for his Options, an amount which Gryglas would only have been entitled to provided he complied with his obligations under the Noncompetition Agreement.

49.     By engaging in the conduct described above, Gryglas has directly breached his obligations under the Noncompetition Agreement.

50.     Gryglas has thus unlawfully benefitted from the receipt of this money for his Options, which in justice and equity belong to Plaintiff.

51.     Permitting Gryglas to retain the value of his Options would be inequitable and result in Gryglas being unjustly enriched.

52.     As a result of Gryglas' conduct, Plaintiff has suffered injury for which it is entitled to declaratory relief and just compensation.

## COUNT THREE
## TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIP

53.     Plaintiff repeats and realleges each and every previously stated allegation of this Complaint as though fully set forth herein.

E-FILED 05/20/2022 01:12 PM   /   CONFIRMATION 1191909   /   A 2201804   /   COMMON PLEAS DIVISION   /   IFOJ

54.     Kendall Shadley, Bryan Beaver, and Jordan Kiphart entered into a valid business relationship with Plaintiff as Plaintiff's employees, including entering into various employment agreements with Plaintiff.

55.     Gryglas had knowledge of the business relationship between Plaintiff and such employees, as well as knowledge that soliciting such employees would cause harm to Plaintiff and its staffing needs.

56.     Gryglas intentionally interfered with these business relationships, which caused damage to Plaintiff, including harming the goodwill between Plaintiff and these employees and knowingly causing such employees to leave Plaintiff's employ.

57.     As a result of Gryglas' conduct, Plaintiff has suffered injury for which it is entitled to declaratory relief and just compensation.

<strong>COUNT FOUR<br>INJUNCTIVE RELIEF</strong>

58.     Plaintiff repeats and realleges each and every previously stated allegation of this Complaint as though fully set forth herein.

59.     Plaintiff has a strong likelihood of success on the merits, as it is clear that the Noncompetition Agreement and the ISO Agreement between Gryglas and Plaintiff constitute valid and enforceable agreements, the terms of which Gryglas breached when he commenced employment with a direct competitor of Plaintiff and thereafter solicited at least three of Plaintiff's employees.

60.     Plaintiff has and will continue to suffer irreparable damage to the goodwill of its employees.

61.     Gryglas suffers no harm from the issuance of an injunction requiring Gryglas to abide by the terms of his agreed-up contracts with Plaintiff.

11

62. As a result of Gryglas' conduct, Plaintiff has suffered irreparable injury for which it is entitled to injunctive relief.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests that this Court issue an order:

(A) Rendering declaratory judgment as to Plaintiff's rights;

(B) Enjoining Gryglas from using, disclosing, accessing, communicating, and copying, any of Plaintiff's confidential and proprietary information;

(C) Enjoining Gryglas from working at, being employed by or performing services for PatientIQ or any other competitor of Plaintiff;

(D) Enjoining Gryglas, and anyone acting in concert with him or on his behalf, from contacting, for any reason, any employee, distributor, supplier, client or customer of Plaintiff;

(E) Awarding Plaintiff compensatory damages in an amount to be determined at trial, including but not limited to restitution in the amount of $466,261;

(F) Awarding Plaintiff punitive damages in an amount to be determined at trial;

(G) Awarding Plaintiff all of its costs and fees it incurred and will incur in connection with this litigation, including attorneys' fees, as specifically contemplated by the Noncompetition Agreement; and

(H) Granting such other and further relief as the Court deems just and proper.

E-FILED 05/20/2022 01:12 PM / CONFIRMATION 1191909 / A 2201804 / COMMON PLEAS DIVISION / IFOJ

Respectfully submitted,

/s/ *Jacob D. Mahle*
Jacob D. Mahle (0080797)
Wesley R. Abrams (0095746)
Vorys, Sater, Seymour and Pease LLP
301 E. Fourth St., Suite 3500
Cincinnati, Ohio
(513) 723-8589
jdmahle@vorys.com
wrabrams@vorys.com

Tao Leung
(*Pro Hac Vice* Motion forthcoming)
Maria Benvenuto
(*Pro Hac Vice* Motion forthcoming)
tao.leung@hoganlovells.com
maria.benvenuto@hoganlovells.com
1999 Avenue of the Stars
Suite 1400
Los Angeles, CA 90067
Tel: (310) 785-4631
Fax: (310) 785 4601

*Attorneys for Plaintiff*

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

/s/ *Jacob D. Mahle*
Jacob D. Mahle

13

## **PRAECIPE TO THE CLERK**

Please serve a copy of the foregoing complaint by certified mail, return receipt requested,

upon the following:

Steven Gryglas
308 North Addison Avenue
Elmhurst, IL 60126

/s/ *Jacob D. Mahle*
Jacob D. Mahle

14

# EXHIBIT A

# HALO COMMUNICATIONS, INC.

## NONCOMPETITION, CONFIDENTIALITY AND INTELLECTUAL PROPERTY AGREEMENT

THIS NONCOMPETITION, CONFIDENTIALITY AND INTELLECTUAL PROPERTY AGREEMENT (this "**Agreement**") is dated as of ___11/14/19___, 2019 (the "**Effective Date**") and is made by and between Halo Communications, Inc., a Delaware corporation (the "**Company**"), and the undersigned (the "**Participant**" and together with Company, collectively, the "**Parties**").

In consideration of the Participant's employment or other engagement with the Company, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agrees as follows:

**Noncompetition:** During the period of the Participant's engagement by or relationship with the Company and for the one (1) year period immediately following the termination of the Participant's engagement by or relationship with the Company for any reason, the Participant will not directly or indirectly (whether as an officer, director, stockholder, partner, proprietor, associate, representative, consultant or in any capacity whatsoever) engage in, become financially interested in, be employed by or have any business connection with any person, corporation, firm, partnership or any other entity whatsoever which competes with the Company anywhere in the world.

**Nonsolicitation; Customers:** During the period of the Participant's engagement by or relationship with the Company and for the one (1) year period immediately following the termination of the Participant's engagement by or relationship with the Company for any reason, the Participant shall not solicit, directly or indirectly, for or on behalf of any person, corporation, firm, partnership or any other entity whatsoever which competes with the Company anywhere in the world, (i) any customers of the Company who or which were customers of the Company at any time during the Participant's engagement by or relationship with the Company, or (ii) any potential customers of the Company with whom the Participant had contact on behalf of the Company during the Participant's engagement by or relationship with the Company.

**Nonsolicitation; Employees:** During the period of the Participant's engagement by or relationship with the Company and for the one (1) year period immediately following the termination of the Participant's engagement by or relationship with the Company, the Participant shall not solicit or hire, directly or indirectly, on the Participant's behalf or on behalf of any other person or entity, any person employed by the Company except with the specific prior written consent of the Company.

The Participant represents that the Participant's experience, capabilities and circumstances are such that the foregoing noncompetition and nonsolicitation provisions will not prevent the Participant from earning a livelihood. The Participant further agrees that the foregoing limitations set forth in the foregoing noncompetition and nonsolicitation provisions (including, without limitation, the time limitations) are reasonable and properly required for the adequate protection of the current and future businesses of the Company. The Participant further

acknowledges that a remedy at law for any breach or threatened breach of the foregoing noncompetition and nonsolicitation provisions would be inadequate and will cause immediate and irreparable harm to the Company in a manner that cannot be measured nor adequately compensated in damages.  The Participant further acknowledges that in the event of any such breach or threatened breach, and in addition to any and all other remedies that it may have at law or in equity, the Company shall be entitled to temporary, preliminary and permanent injunctive relief to restrain such breach or threatened breach by the Participant, and to recover all costs and expenses, including reasonable attorneys' fees, of any proceedings brought to obtain such injunctive relief. Nothing contained herein shall restrict or limit in any manner the Company's right to seek and obtain any form of relief, legal or equitable, against the Participant in an action brought to enforce its rights under the foregoing noncompetition and nonsolicitation provisions.

**Inventions Assignment:**    All technology, ideas, concepts, inventions, modifications, discoveries, designs, developments, improvements, processes, software programs, documentation, formulae, data, techniques, know-how, secrets and any other works of authorship or intellectual property rights whatsoever or any interest therein (whether or not patentable or registrable under copyright or similar statutes or subject to analogous protection) (collectively, "**Inventions**") developed, devised, made, learned of, conceived or reduced to practice by the Participant, either solely or in collaboration with others, whether before or after the Effective Date of this Agreement, that (i) relates to the business of the Company, (ii) results from work performed by the Participant for the Company or (iii) results from the use of premises or property (whether tangible or intangible) owned, leased or contracted for by the Company (hereinafter collectively called "**Work Product**") are the exclusive property of the Company. The Company owns all right, title and interest in and to the Work Product.  For clarity, however, "Work Product" shall not include any Invention created by the Participant if such Invention does not relate to the Company's business and does not result from work performed for the Company or the use of the Company's premises or property.

All Work Product is "works made for hire," and the Company is the "person for whom the work was prepared."  As between the Parties, the Company is the author and/or owner, as appropriate, of the Work Product for purposes of patent, copyright or trademark law and is entitled to secure patent, copyright and trademark protection in the Company's name, if and as applicable, and the Participant agrees to cooperate with the Company as reasonably necessary for the Company to secure such patent, copyright and trademark protection.  To the extent that the Work Product and any intellectual property rights therein or related thereto are deemed or treated as not "works made for hire," the Participant hereby expressly and irrevocably assigns to the Company all of the Participant's right, title and interest in and to the Work Product and any and all intellectual property rights therein or related thereto.

The Participant represents and warrants to the Company that the Participant has full authority to enter into this Agreement and that in performing under this Agreement, the Participant will not violate the terms of any agreement with any third party.  The Participant has disclosed, and will continue to disclose to the Company, all tools, technology or other intellectual property owned or held by a third party which is used by the Participant in connection with the Participant's employment or other engagement with the Company.

2

**Confidentiality:** The Participant will have access to and will participate in the development of and/or be acquainted with confidential or proprietary information of the Company (the **"Confidential Information"**). The term "Confidential Information" does not include any information that is or becomes generally publicly available (other than as a result of violation of this Agreement by the Participant). The Participant will not disclose, use or make known for the Participant's or another's benefit (other than for the benefit of the Company) any Confidential Information or use any such Confidential Information in any way.

**General:** No agreements, representations or understandings (whether oral or written and whether express or implied) which are not expressly set forth in this Agreement have been made or entered into by the Parties with respect to the subject matter hereof. This Agreement contains the entire understanding of the Parties with respect to the subject matter hereof and supersedes any and all prior or contemporaneous written or oral understandings of any kind or nature which relate to the subject matter hereof, provided that any other confidential information, noncompetition, nonsolicitation or inventions assignment agreement or instrument governing the period of time during which the Participant hereto was previously engaged by or had a relationship with the Company as a member, manager, officer, principal, employee, consultant or contractor shall remain in full force and effect to the extent provided for in such agreements or instruments and in respect of the period of time prior to the Effective Date.

The Parties intend this Agreement to be enforced as written. However, if any portion or provision of this Agreement is to any extent declared illegal or unenforceable by a duly authorized court having jurisdiction, then the remainder of this Agreement, or the application of such portion or provision in circumstances other than those as to which it is so declared illegal or unenforceable, will not be affected thereby, and each portion and provision of this Agreement will be valid and enforceable to the fullest extent permitted by law.

This Agreement, and any provision hereof, may only be amended, modified, waived or terminated by the written consent of the Participant and the Company.

This Agreement shall inure to the benefit of and be binding upon the Company and the Participant, and the legal representatives, successors and assigns of each. The term "successors and assigns" as used herein shall include a corporation or other entity acquiring all or substantially all of the business of the Company (whether such acquisition is by way of acquisition of assets, acquisition of stock, merger, consolidation or otherwise, and whether by operation of law or otherwise). In furtherance thereof, the provisions hereof shall survive (i) the termination of the Participant's employment or other engagement with the Company, and (ii) the assignment of this Agreement by the Company to any successor in interest or other assignee of the Company, including without limitation any entity into which the Company is merged, consolidated, or converted after the Effective Date.

During and after the Participant's employment or other engagement with the Company, the Participant agrees to reasonably cooperate with the Company to (i) apply for, obtain, perfect and transfer to the Company the Work Product as well as any and all intellectual property rights in the Work Product in any jurisdiction throughout the world and (ii) maintain, protect and enforce the same, including, without limitation, giving testimony and executing and delivering to the

3

Company any and all applications, oaths, declarations, affidavits, waivers, assignments and other documents and instruments as shall be requested by the Company.

This Agreement shall be governed by and construed in accordance with the internal laws (and not the law of conflicts) of the State of Ohio and the federal laws of the United States applicable therein. Any and all disputes arising under this Agreement, whether as to interpretation, performance or otherwise, shall be subject to the exclusive jurisdiction of the courts of the County of Hamilton, State of Ohio and the federal courts located therein and each of the Parties hereto hereby irrevocably attorns to the exclusive jurisdiction of the courts of the County of Hamilton, State of Ohio and the federal courts located therein. None of the Parties shall contest in any other jurisdiction the enforcement of any judgment or award of the courts of the County of Hamilton, State of Ohio in relation to this Agreement.

This Agreement may be executed in one or more counterparts, all of which shall constitute one and the same instrument.

**Agreed as of the Effective Date:**

**HALO COMMUNICATIONS, INC.**

By: _____
Name: Jose Barreau
Title: Chief Executive Officer

**PARTICIPANT**

By: _____
Name: STEVE CORYGLAS

4

# EXHIBIT B

## Option grant holder

| Name | Steve Gryglas |
|------|---------------|
| Email | steve.gryglas@halohealth.com |
| Grant reason | None entered |
| Status | Outstanding |

## Quantities

| Original quantity | 220,244 options (ISO) |
|-------------------|------------------------|
| Exercised quantity | 0 options |
| Remaining quantity | 220,244 options |
| Exercise price | $0.38 (USD) |

## Issuer

| Issued by | Halo Health, Inc. |
|-----------|-------------------|
| Issued from | 2017 EQUITY INCENTIVE PLAN |
| Grant date | Jan. 30, 2020 |
| Board approval date | Jan. 30, 2020 |

## Acceptance agreement

When accepting this option grant on Carta, the option holder agreed to the following:

This Option Grant ES-22 (the "Equity Award") is subject to all of the terms and conditions set forth in this electronic issuance and all of the documents attached hereto (the "Documents"), all of which are incorporated herein in their entirety.

By entering your full name below, you acknowledge that this Equity Award was previously issued to you by the Company. You further acknowledge that as of the date of this award, this electronic issuance and the Documents set forth the entire understanding between you and the Company regarding the Equity Award and supersede all prior agreements, promises and/or representations on that subject. If there is any conflict between the provisions of this electronic issuance and those of the Documents, the provisions of the Documents will control.

Plan Documents:
Equity Incentive Plan:   📎 Halo - Amended and Restated 2017 Equity Incentive Plan - FEB 2020.PDF
Form of Option Agreement:   📎 Halo - Incentive Stock Option Award Agreement -GRYGLAS.pdf
Form of Exercise Agreement:   📎 Halo Health, Inc. - Notice of Exercise.pdf

*Stephen Stanton Gryglas*

Steve Gryglas
05/04/2020   🔒 ee32b039-bdbd-4b6c-a9a9-379111f1551f

## Post-termination exercise periods

E-FILED 05/20/2022 01:12 PM   /   CONFIRMATION 1191909   /   A 2201804   COMMON PLEAS DIVISION   /   IFOJ

| Voluntary termination | 30 Days |
|---|---|
| Involuntary termination | 30 Days |
| Termination with cause | 0 Days |
| Death | 1 Year |
| Disability | 1 Year |
| Retirement | 30 Days |

Refer to your Equity Incentive Plan and Option Agreement for a more detailed explanation of post-termination exercise periods.

## Term

| Expiration of option grant | Jan. 29, 2030 |
|---|---|

## Summary

| Schedule name | 1/48 monthly, 1 year cliff |
|---|---|
| Vesting start | Nov. 5, 2019 |
| Fully vested | Nov. 5, 2023 |
| Cliff | Yes, 25% vests at 1 year |
| Vesting | After the cliff, the remainder of the shares will vest monthly on the same day as the start date for the remaining 36 months. |
| Acceleration | Upon a "Change of Control" as defined in Section 2.7 of the Plan, Optionee's unvested portion of Incentive Stock Options shall become fully vested. |

## Progress

100,945 of the 220,244 options (46%) in ES-22 have vested.

Vesting start: Nov. 5, 2019						Fully vested: Nov. 5, 2023

Legend:   Vested options    Terminated/expired options

| Period | Date | Options vested | Cumulative vested |
|---|---|---|---|
| 1 | Nov. 5, 2020 | 55,061 | 55,061 |
| 2 | Dec. 5, 2020 | 4,588 | 59,649 |
| 3 | Jan. 5, 2021 | 4,588 | 64,237 |
| 4 | Feb. 5, 2021 | 4,589 | 68,826 |
| 5 | March 5, 2021 | 4,588 | 73,414 |
| 6 | April 5, 2021 | 4,589 | 78,003 |
| 7 | May 5, 2021 | 4,588 | 82,591 |
| 8 | June 5, 2021 | 4,588 | 87,179 |
| 9 | July 5, 2021 | 4,589 | 91,768 |
| 10 | Aug. 5, 2021 | 4,588 | 96,356 |

E-FILED 05/20/2022 01:12 PM   /   CONFIRMATION 1191909   /   A 2201804   /   COMMON PLEAS DIVISION   /   IFOJ

| Period | Date | Options vested | Cumulative vested |
|--------|------|----------------|-------------------|
| 11 | Sept. 5, 2021 | 4,589 | 100,945 |
| 12 | Oct. 5, 2021 | 4,588 | 105,533 |
| 13 | Nov. 5, 2021 | 4,589 | 110,122 |
| 14 | Dec. 5, 2021 | 4,588 | 114,710 |
| 15 | Jan. 5, 2022 | 4,588 | 119,298 |
| 16 | Feb. 5, 2022 | 4,589 | 123,887 |
| 17 | March 5, 2022 | 4,588 | 128,475 |
| 18 | April 5, 2022 | 4,589 | 133,064 |
| 19 | May 5, 2022 | 4,588 | 137,652 |
| 20 | June 5, 2022 | 4,588 | 142,240 |
| 21 | July 5, 2022 | 4,589 | 146,829 |
| 22 | Aug. 5, 2022 | 4,588 | 151,417 |
| 23 | Sept. 5, 2022 | 4,589 | 156,006 |
| 24 | Oct. 5, 2022 | 4,588 | 160,594 |
| 25 | Nov. 5, 2022 | 4,589 | 165,183 |
| 26 | Dec. 5, 2022 | 4,588 | 169,771 |
| 27 | Jan. 5, 2023 | 4,588 | 174,359 |
| 28 | Feb. 5, 2023 | 4,589 | 178,948 |
| 29 | March 5, 2023 | 4,588 | 183,536 |
| 30 | April 5, 2023 | 4,589 | 188,125 |
| 31 | May 5, 2023 | 4,588 | 192,713 |
| 32 | June 5, 2023 | 4,588 | 197,301 |
| 33 | July 5, 2023 | 4,589 | 201,890 |
| 34 | Aug. 5, 2023 | 4,588 | 206,478 |
| 35 | Sept. 5, 2023 | 4,589 | 211,067 |
| 36 | Oct. 5, 2023 | 4,588 | 215,655 |
| 37 | Nov. 5, 2023 | 4,589 | 220,244 |

## Exercise legend

No legend has been included.

## Exercise history

This option grant has not yet been exercised.

## Compliance

| | |
|---|---|
| Federal exemption | Rule 701 |
| State exemption | None entered |
| State of residency | None entered |

Learn about exemptions ›

E-FILED 05/20/2022 01:12 PM   /   CONFIRMATION 1191909   /   A 2201804   /   COMMON PLEAS DIVISION   /   IFOJ

## Approvals

✓   **Initiated by Louise Rodrigues**
     Approved April 20, 2020  🔒 5e7cf44d16694a7fa7af47e6d571e8d8

---

✓   **Signed by Jose Barreau**
     Approved April 30, 2020  🔒 e7527600c91d4affab88edb0fadd83d5

---

✓   **Received by Steve Gryglas**
     Approved May 4, 2020  🔒 ee32b039bdbd4b6ca9a9379111f1551f

## Documents and notes

| | |
|---|---|
| Equity Incentive Plan | 🏷 Halo - Amended and Restated 2017 Equity Incentive Plan - FEB 2020.PDF |
| Form of Option Agreement | 🏷 Halo - Incentive Stock Option Award Agreement -GRYGLAS.pdf |
| Form of Exercise Agreement | 🏷 Halo Health, Inc. - Notice of Exercise.pdf |

E-FILED 05/20/2022 01:12 PM  /  CONFIRMATION 1191909  /  A 2201804  /  COMMON PLEAS DIVISION  /  IFOJ

E-FILED 05/20/2022 01:12 PM   /   CONFIRMATION 1191909   /   A 2201804   /   COMMON PLEAS DIVISION   /   IFOJ

**HALO COMMUNICATIONS, INC.**
**AMENDED AND RESTATED 2017 EQUITY INCENTIVE PLAN**

## SECTION I

### ESTABLISHMENT, PURPOSE, DURATION

**1.1** **_Establishment and Amendment and Restatement of the Original Plan_**. Halo Communications, Inc., a Delaware corporation f/k/a Doc Halo, Inc. (the "**_Company_**"), previously established an incentive compensation plan known as the Doc Halo, Inc. 2017 Equity Incentive Plan (the "**_Original Plan_**"), which was adopted by the Board of Directors of the Company (the "**_Board_**") and the stockholders of the Company effective as of March 31, 2017 (the "**_Original Effective Date_**"). Thereafter, on March __1__, 2019, the Board and the stockholders elected to amend and restate the Original Plan, in its entirety, with this Amended and Restated 2017 Equity Incentive Plan (this "**_Plan_**"). The effective date of this Plan is March __1__, 2019 (the "**_Effective Date_**").

**1.2** **_Purposes of the Plan_**. The purposes of the Plan are to (i) attract and retain Eligible Persons by providing compensation opportunities that are competitive with other companies; (ii) provide incentives to those Eligible Persons who contribute significantly to the long-term performance and growth of the Company and Subsidiaries of the Company; and (iii) align Eligible Person's long-term financial interests with those of the Company's stockholders.

**1.3** **_Duration of the Plan_**. The Plan shall commence on the Original Effective Date and shall remain in effect, subject to the right of the Board to amend or terminate the Plan at any time under Section VII hereof, until the later of (a) the day immediately following the tenth (10th) anniversary of the Original Effective Date and (b) the day all Shares subject to it shall have been purchased or acquired according to the Plan's provisions.

## SECTION II

### DEFINITIONS

For purposes of this Plan, the following terms shall have the following meanings:

**2.1** "**_Advisor_**" means a person who provides bona fide advisory or consulting services to the Company or a Subsidiary.

**2.2** "**_Award_**" means Incentive Stock Options and Non-Qualified Stock Options granted under this Plan.

**2.3** "**_Award Agreement_**" means a written agreement by which an Award is evidenced.

**2.4** "**_Award Term_**" means the period beginning on a Grant Date and ending on the expiration date of such Award.

**2.5** "**_Board_**" has the meaning set forth in Section 1.1.

24252224.4

**2.6** "**_Cause_**" means, unless otherwise defined in an Award Agreement, a Participant's engaging in any of the following acts:

(i)     disloyalty to the Company or a Subsidiary, including, without limitation, fraud, embezzlement, theft, or dishonesty in the course of a Participant's employment or business relationship with the Company or a Subsidiary;

(ii)    conviction of a felony or other crime involving a breach of trust or fiduciary duty

E-FILED 05/20/2022 01:12 PM  /  CONFIRMATION 1191909  /  A 2201804  /  COMMON PLEAS DIVISION  /  IFOJ

(ii) conviction of a felony or other crime involving a breach of trust or fiduciary duty owed to the Company;

(iii)    unauthorized disclosure of trade secrets or confidential information of the Company or a Subsidiary;

(iv)    a material breach of any agreement with the Company in respect of confidentiality, non-disclosure, non-competition or otherwise; or

(v)    any violation of a policy of the Company that is materially damaging to the interests of the Company.

A Participant who agrees to resign from his employment or other affiliation with the Company or a Subsidiary in lieu of being terminated for Cause shall be deemed to have been terminated for Cause for purposes of this Plan.

**2.7**    "*Change in Control*" means the occurrence after the effective date of this Plan of one of the following events:

(i)    the Company shall be reorganized, merged, consolidated or shall otherwise consummate a business combination with another corporation and as a result of such reorganization, merger, consolidation or other business combination less than fifty percent (50%) of the outstanding voting securities entitled to vote generally in the election of directors of the surviving or resulting corporation (or any ultimate parent thereof) shall be owned in the aggregate by the former stockholders of the Company as the same shall have existed immediately prior to such reorganization, merger, consolidation or other business combination; however, for purposes of this calculation voting securities of the Company held by affiliates (within the meaning of the Securities Exchange Act of 1934, as amended (the "*Exchange Act*")) of any party to such reorganization, merger, consolidation or other business combination shall not be included in the aggregate shares owned by the "former stockholders of the Company";

(ii)    the Company shall sell substantially all of its assets to another corporation or legal entity, other than to a corporation or other legal entity with respect to which, following such sale or other disposition, at least fifty percent (50%) of the then outstanding voting securities of such legal entity entitled to vote generally in the election of directors is then beneficially owned, directly or indirectly, by all or substantially all of the individuals and entities who were the beneficial owners of the outstanding voting securities of the Company immediately prior to such sale in substantially the same proportion as their ownership, immediately prior to such sale, of the outstanding voting securities of the Company; or

2

(iii)     a person, within the meaning of Section 3(a)(9) or of Section 13(d)(3) of the Exchange Act, shall acquire more than fifty percent (50%) of the outstanding voting securities entitled to vote generally in the election of directors of the Company (whether directly, beneficially or of record).

For purposes hereof, ownership of voting securities shall take into account and shall include ownership as determined by applying the provisions of Rule 13d-3(d)(1)(i) pursuant to the Exchange Act. Notwithstanding the occurrence of any of the foregoing events, an initial public offering of equity securities of the Company ("*IPO*") shall not be deemed to be a Change in Control. In addition, a Change in Control shall not occur with respect to a Participant if, in advance of such event, the Participant agrees in writing that such event shall not constitute a Change in Control.

**2.8**      "*Code*" means the Internal Revenue Code of 1986, as amended, and the regulations and rulings thereunder. References to any particular section of the Code include references to any successor amendments or replacements of such section.

**2.9**      "*Committee*" means the Compensation Committee of the Board, or in the absence of any such Committee, the Board as a whole.

**2.10**     "*Common Stock*" means Common Stock, par value $0.0001 per Share, of the Company (and any successor security).

**2.11**     "*Company*" has the meaning set forth in Section 1.1.

**2.12**     "*Director*" means any person serving on the Board of Directors of the Company who is not an Officer (or officer) or Employee of the Company or a Subsidiary.

**2.13**     "*Disability*" means, unless otherwise defined in an Award Agreement, that the Employee-Participant meets one of the following requirements: (i) the Employee-Participant is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or can be expected to last for a continuous period of not less than 12 months as determined by the Committee, (ii) the Employee-Participant is, by reason of any medically determinable physical or mental impairment which can be expected to result in death or can be expected to last for a continuous period of not less than 12 months, receiving income replacement benefits for a period of not less than 3 months under an accident and health plan covering employees of the Company or a Subsidiary, (iii) the Employee-Participant is determined to be totally disabled by the Social Security Administration, or (iv) the Employee-Participant is determined to be disabled in accordance with a disability insurance program, provided that the definition of disability applied under such disability insurance program complies with the requirements of (i) or (ii) above.

**2.14**     "*Effective Date*" has the meaning set forth in Section 1.1.

**2.15**     "*Eligible Person*" means any individual who is an Employee, Officer, Director, or Advisor.

3

24252224.4

**2.16** "***Employee***" means (i) any employee of the Company or a Subsidiary, including those employees on military leave, sick leave, or other bona fide leave of absence approved by the Company or a Subsidiary, or (ii) any person who has received and accepted an offer of employment from the Company or a Subsidiary.

**2.17** "***Exercise Price***" means the price at which a Share may be purchased by a Participant pursuant to an Option.

**2.18** "***Fair Market Value***" means, as of any date other than the date of an IPO meeting the requirements described below, (i) if the Shares are readily tradable on an established securities market, such value as the Committee shall determine in accordance with Section 409A of the Code, or (ii) if the Shares are not readily tradable on an established securities market, which is the case as of the Effective Date of this Plan, such value as the Committee shall determine by either (a) the reasonable application of a reasonable valuation method that complies with the requirements of Section 409A of the Code or (b) by using one of the presumptive reasonable valuation methods described in the Treasury Regulations. Solely as of the date of an IPO of Common Stock pursuant to an effective registration statement filed with the Securities and Exchange Commission (other than a registration statement on Form S-8 or S-4 or any other form for similar limited purpose), "***Fair Market Value***" of a Share shall mean the price to the public pursuant to the form of final prospectus used in connection with the IPO, as indicated on the cover page of such prospectus or otherwise.

**2.19** "***Good Reason***" means, unless otherwise provided in an Award Agreement, with respect to any particular Employee: (i) a reduction in the Employee's base salary or bonus potential; (ii) a material diminution in the Employee's duties and responsibilities with the Company or a Subsidiary; (iii) the Company requiring that the Employee work for the Company or a Subsidiary full-time at a location more than seventy-five (75) miles away from the Employee's then-current place of work and more than seventy-five (75) miles away from the Employee's home; or (iv) a material breach by the Company of any material agreement in place between the Company and the Employee; provided, however, that any of the foregoing events shall constitute "***Good Reason***" only if the affected Employee has given written notice to the Company promptly (and in any event, within thirty (30) days) following the occurrence of such event and the Company has not cured such event within thirty (30) days following such notice.

**2.20** "***Grant Date***" means the date on which the Committee grants the Award or such later date specified by the Committee in the Award Agreement.

**2.21** "***Incentive Stock Option***" means any Stock Option awarded under Section VI of this Plan intended to be and designated as an "Incentive Stock Option" within the meaning of Section 422 of the Code.

**2.22** "***Non-Qualified Stock Option***" means any Stock Option awarded under Section VI of this Plan that is not an Incentive Stock Option.

**2.23** "***Officer***" means a person who has been appointed as an officer of the Company by the Board.

**2.24** "***Original Effective Date***" has the meaning set forth in Section 1.1.

4

24252224.4

E-FILED 05/20/2022 01:12 PM   /   CONFIRMATION 1191909   /   A 2201804   /   COMMON PLEAS DIVISION   /   IFOJ

**2.25** "***Participant***" means an Eligible Person who has been granted an Award.

**2.26** "***Share***" means a share of Common Stock.

**2.27** "***Stock Option***" or "***Option***" means the right to purchase a specified number of Shares at a stated Exercise Price for a specified period of time subject to the terms, conditions and limitations described or referred to in Section VI. The term "Stock Option" as used in this Plan includes the terms "Non-Qualified Stock Option" and "Incentive Stock Options".

**2.28** "***Subsidiary***" means any entity that is directly or indirectly controlled by the Company.

**2.29** "***Treasury Regulations***" means regulations in force as final or temporary that have been issued by the U.S. Department of the Treasury pursuant to its authority under the Code, and any successor regulations.

## SECTION III

## ADMINISTRATION

**3.1** ***The Committee***. This Plan shall be administered and interpreted by the Committee. Any function of the Committee also may be performed by the Board. Actions of the Committee may be taken by a majority of its members at a meeting at which a quorum is present or by the unanimous written consent of all of its members without a meeting.

**3.2** ***Powers of the Committee***. The Committee shall have the power and authority to operate, manage and administer the Plan on behalf of the Company, which includes, but is not limited to, the power and authority:

(i)     to grant to Eligible Persons one or more Awards;

(ii)    to select the Eligible Persons to whom Awards may be granted;

(iii)   to determine the number of Shares which may be subject to each Award;

(iv)    to determine the terms and conditions, not inconsistent with the terms of the Plan, of any Award (including, but not limited to, the term, price, exercisability, method of exercise and payment, any restriction or limitation on transfer, any vesting schedule or acceleration, or any forfeiture provisions or waiver, regarding any Award) and the related Shares, based on such factors as the Committee shall determine; and

(v)     to modify or waive any restrictions, contingencies or limitations contained in, and grant extensions to the terms or exercise periods of, or accelerate the vesting of, any outstanding Awards, as long as such modifications, waivers, extensions or accelerations would not cause the Award to be treated as the granting of a new Award under Code Section 409A that is not exempt from, or compliant with, the requirements of Section 409A or be inconsistent with the terms of the Plan, but no such changes shall impair the

rights of any Participant without his or her consent unless required by law or integrally related to a requirement of law.

**3.3    *Guidelines*.** The Committee will have the authority and discretion to interpret the Plan and any Awards granted under the Plan, to establish, amend, and rescind any rules and regulations relating to the Plan, and to make all other determinations that may be necessary or advisable for the administration of the Plan. The Committee may correct any defect, supply any omission or reconcile any inconsistency in the Plan or in any related Award Agreement in the manner and to the extent it deems necessary to carry the Plan into effect.

**3.4    *Delegation of Authority*.** The Committee may delegate its ministerial duties under the Plan to one or more of the Company's Officers or other employees of the Company or a Subsidiary, with such conditions and limitations as the Committee shall prescribe in writing; provided, however, that only the Committee is authorized to grant Awards to, or make any decisions with respect to Awards granted under the Plan. A record of all actions taken by any Officer or Employee to whom the Committee has delegated a portion of its ministerial duties shall be filed with the minutes of the meetings of the Committee and shall be made available for review by the Committee upon request.

**3.5    *Decisions Final*.** Any action, decision, interpretation or determination by or at the direction of the Committee (or of any person acting under a delegation pursuant to Section 3.4) concerning the application or administration of the Plan or any Award(s) shall be final and binding upon all persons and need not be uniform with respect to its determination of recipients, amount, timing, form, terms or provisions of Awards.

**3.6    *Award Agreements*.** Each Award under the Plan shall be evidenced by an Award Agreement substantially in the form approved by the Committee from time to time.

## SECTION IV

## SHARES SUBJECT TO PLAN

**4.1    *Shares Available for Issuance of Awards*.** Subject to adjustment as provided in Section 4.3, the aggregate number of Shares which may be issued under this Plan shall not exceed 2,879,737 Shares. As determined from time to time by the Committee, the Shares available under this Plan for grants of Awards may consist either in whole or in part of authorized but unissued Shares or Shares which have been reacquired by the Company following original issuance. The maximum number of Shares that may be issued upon the exercise of Incentive Stock Options shall be 2,879,737.

**4.2    *Re-Use of Shares*.** If any Award granted under this Plan shall expire, terminate or be forfeited or canceled for any reason before it has vested or been exercised in full or is settled without the issuance of Shares, the number of unissued or undelivered Shares subject to such Award, to the extent of any such expiration, termination, forfeiture or cancellation, shall again be available for grant under the Plan. If any Shares are withheld or applied as payment by the Company in connection with the exercise of an Award or the withholding of taxes related thereto, any Shares so withheld or applied as payment shall not be available for subsequent

6

Awards under the Plan. The Committee may make such other determinations regarding the counting of Shares issued pursuant to this Plan as it deems necessary or advisable, provided that such determinations shall be permitted by law.

 **4.3**   *Adjustment Provisions*. In the event of any change in the Company's capital structure on account of any extraordinary dividend, stock dividend, stock split, reverse stock split, combination or exchange of equity securities, merger, consolidation, recapitalization, reorganization, divestiture or other distribution (other than ordinary cash dividends) of assets to stockholders, or any other similar event affecting the Company's capital structure, the Committee shall make such adjustments as are necessary and appropriate to prevent dilution or enlargement of the benefits or potential benefits intended to be made available under this Plan to any or all of (i) the maximum number of Shares that may be issued under the Plan as set forth in Section 4.1; (ii) the number or kind of Shares subject to an outstanding Award; (iii) the Exercise Price applicable to an outstanding Award; and/or (iv) any measure of performance that relates to an outstanding Award in order to reflect such change in the Common Stock. Any adjustment to Incentive Stock Options under this Section 4.3 shall be made only to the extent not constituting a "modification" within the meaning of Section 424(h)(3) of the Code. With respect to Awards subject to Section 409A of the Code, any adjustments or substitutions under this Section 4.3 shall conform to the requirements of Section 409A of the Code. The Committee shall give each Participant notice of an adjustment or substitution hereunder and, upon notice, such adjustment or substitution shall be conclusive and binding for all purposes.

## SECTION V

## CHANGE IN CONTROL

 **5.1**   *Effect of Change in Control on Outstanding Awards*. With respect to the unvested portion of each then outstanding Award, the Committee may, in its sole discretion, at any time prior to, coincident with or after the occurrence of a Change in Control, (a) provide for the acceleration of any time periods relating to vesting so that such unvested portion may be vested and exercised on or before a date fixed by the Committee, or (b) make any other adjustment as the Committee deems necessary or appropriate to reflect such transaction or change, but no such adjustment shall impair the rights of any Participant in any material way without his or her consent unless required by law or integrally related to a requirement of law. In addition, notwithstanding any provision of this Plan to the contrary, except as otherwise provided in an Award Agreement, the Committee may, in its sole discretion, at any time prior to, coincident with or after the occurrence of a Change in Control:

 (i)   provide for the purchase of any then outstanding Awards, with or without the Participant's request, for an amount of cash equal to the amount that could have been obtained upon the exercise of such rights;

 (ii)   provide for termination of any then outstanding Awards, or make any other adjustment to the Awards then outstanding as the Committee deems necessary or appropriate to reflect such transaction or change; or

7

(iii)    cause the Awards then outstanding to be assumed, or new rights substituted therefore, by the surviving entity in such Change in Control

Should any event constitute a Change in Control for purposes of the Plan, but not constitute a change of control within the meaning of Section 409A of the Code, if necessary to avoid adverse tax consequences to any Participant, no payment or distribution shall be made to any affected Participant by reason of such Change in Control without the express written consent of the affected Participant.

## SECTION VI

## STOCK OPTIONS

**6.1**    *Types of Grants*.  Each Option granted shall be designated as either a Non-Qualified Stock Option or an Incentive Stock Option.

**6.2**    *Terms of Options*.  Except as otherwise required by Sections 6.3, Options granted under this Plan shall be subject to the following terms and conditions and shall be in such form and contain such additional terms and conditions, not inconsistent with the terms of this Plan, as the Committee shall deem desirable:

(i)      **Option Price**.  The Option Price per Share purchasable under a Stock Option shall be determined by the Committee at the time of grant, except that in no event shall the Option Price be less than one hundred percent (100%) of Fair Market Value on the Grant Date.

(ii)     **Option Term**.  Options shall expire after such period, not to exceed ten years from the Grant Date, as may be determined by the Committee.

(iii)    **Vesting**.  A Stock Option shall become vested at such time or times as shall be specified in the Award Agreement.

(iv)     **Exercisability**.  Subject to the terms of this Plan, a Stock Option shall be exercisable at such time or times as shall be specified in the Award Agreement.  If an Option is exercisable in installments, such installments or portions thereof that become exercisable shall remain exercisable until the Option expires or is otherwise canceled pursuant to its terms.

(v)      **Non-Transferability of Options**.  Stock Options shall be transferable only to the extent provided in Section 8.3 of this Plan.

(vi)     **Fixed Number of Shares**.  Subject to the requirements of Section 4.3, the number of Shares subject to a Stock Option shall be fixed on the Grant Date.

**6.3**    *Termination of Employment, Disability, or Death.*  Except as otherwise provided in an Award Agreement:

8

24252224.4

(i)    Except as provided below, an Option may only be exercised while the Eligible Person is employed by, or providing service to the Company or a Subsidiary as an Employee, Officer, Director, or Advisor. In the event that a Eligible Person ceases to be employed by, or provide service to, the Company or a Subsidiary for any reason other than Disability, death, or termination for Cause or voluntary resignation without Good Reason, any Option which is otherwise exercisable by the Eligible Person shall terminate unless exercised within 30 days after the date on which the Eligible Person ceases to be employed by, or provide service to, the Company or a Subsidiary, but in any event no later than the date of expiration of the Award Term. Any of the Eligible Person's Options that are not otherwise exercisable as of the date on which the Eligible Person ceases to be employed by, or provide service to, the Company or a Subsidiary shall terminate as of such date.

(ii)    If the Eligible Person ceases to be employed by, or provide service to, the Company or a Subsidiary on account of a termination for Cause by the Company or a Subsidiary or a voluntary resignation by the Eligible Person without Good Reason, any Option held by the Eligible Person shall terminate as of the date the Eligible Person ceases to be employed by, or provide service to, the Company. In addition, notwithstanding any other provisions of this Section 6.3, if the Committee determines that the Eligible Person has engaged in conduct that constitutes Cause at any time while the Eligible Person is employed by, or providing service to, the Company or after the Eligible Person's termination of employment or service, any Option held by the Eligible Person shall immediately terminate, and the Eligible Person shall automatically forfeit all Shares underlying any exercised portion of an Option for which the Company has not yet delivered the share certificates, upon refund by the Company of the Exercise Price paid by the Eligible Person for such Shares. Upon any exercise of an Option, the Company may withhold delivery of share certificates pending resolution of an inquiry that could lead to a finding resulting in a forfeiture. Furthermore, if an Eligible Person's employment or consulting relationship with the Company is suspended pending an investigation of whether the Eligible Person shall be terminated for Cause, all the Eligible Person's rights under any Option likewise shall be suspended during the investigation period and the Eligible Person shall have no right to exercise any outstanding Option.

(iii)    If the Eligible Person ceases to be employed by, or provide service to, the Company or a Subsidiary because the Eligible Person is Disabled, any Option which is otherwise exercisable by the Eligible Person shall terminate unless exercised within one year after the date on which the Eligible Person ceases to be employed by, or provide service to, the Company, but in any event no later than the date of expiration of the Option term. Any of the Eligible Person's Options which are not otherwise exercisable as of the date on which the Eligible Person ceases to be employed by, or provide service to, the Company shall terminate as of such date.

(iv)    If the Eligible Person dies while employed by, or providing service to, the Company or within 30 days after the date on which the Eligible Person ceases to be employed or provide service on account of a termination specified in Section 6.3(i) above, any Option that is otherwise exercisable by the Eligible Person shall terminate unless exercised within one year after the date on which the Eligible Person ceases to be

9

24252224.4

employed by, or provide service to, the Company (or within such other period of time as may be specified by the Committee), but in any event no later than the date of expiration of the Option term. Any of the Eligible Person's Options that are not otherwise exercisable as of the date on which the Eligible Person ceases to be employed by, or provide service to, the Company shall terminate as of such date. The date on which an Eligible Person ceases to be employed by, or provide services to, the Company or a Subsidiary shall be conclusively determined by the Committee.

**6.4    *Incentive Stock Options*.**  Incentive Stock Options shall be subject to the following terms and conditions:

(i)    *Award Agreement*.  Any Award Agreement relating to an Incentive Stock Option shall contain such terms and conditions as are required for the Option to be an "incentive stock option" as that term is defined in Section 422 of the Code.  At the discretion of the Committee, Incentive Stock Options may be granted to any Employee of the Company and its parent or any Subsidiary of the Company, as such terms are defined in Sections 424(e) and (f) of the Code.  Incentive Stock Options may not be granted to non-Employees.

(ii)    *Ten Percent Stockholder*.  Notwithstanding anything to the contrary in this Section 6.3, if an Incentive Stock Option is granted to an Employee who owns stock representing more than ten percent of the voting power of all classes of stock of the Company or of a Subsidiary or parent, as such terms are defined in Section 424(e) and (f) of the Code, the term of the Option shall not exceed five years from the Grant Date of such Option and the Exercise Price shall be at least one hundred ten percent (110%) of the Fair Market Value (at the Grant Date) of the Common Stock subject to the Option.

(iii)    *$100,000 Per Year Limitation for ISOs*.  To the extent the aggregate Fair Market Value (determined at the time of grant) of the Common Stock for which Incentive Stock Options are exercisable for the first time by any Employee during any calendar year (under all plans of the Company) exceeds one hundred thousand dollars ($100,000), such excess Incentive Stock Options shall be treated as Non-Qualified Stock Options.

(iv)    *Disqualifying Dispositions*.  Each Employee awarded an Incentive Stock Option under the Plan shall notify the Company in writing immediately after the date he or she makes a disqualifying disposition of any Shares acquired pursuant to the exercise of such Incentive Stock Option.  A disqualifying disposition is any disposition (including any sale) of such Common Stock before the later of (i) two years after the time of grant of the Incentive Stock Option or (ii) one year after the date the Employee acquired the Shares by exercising the Incentive Stock Option.  The Company may, if determined by the Committee and in accordance with procedures established by it, retain possession of any Shares acquired pursuant to the exercise of an ISO as agent for the applicable Employee until the end of the period described in the preceding sentence, subject to complying with any instructions from such Employee as to the sale of such Stock.

**6.5    *Conditions of Exercise*.**  In addition to all other conditions set forth in this Plan and in any applicable Award Agreement, it shall be a condition of exercise of any Stock Option

24252224.4

10

E-FILED 05/20/2022 01:12 PM  /  CONFIRMATION 1191909  /  A 2201804  /  COMMON PLEAS DIVISION  /  IFOJ

that the Participant agree in writing to be bound by the terms of the Company's Amended and Restated Voting Agreement and Amended and Restated Right of First Refusal and Co-Sale Agreement, each dated as of March __1__, 2019, as either may be amended, restated and/or supplemented from time to time, or any successor agreement covering similar subject matter. Upon satisfaction of the applicable conditions relating to vesting and exercisability, as determined by the Committee, and upon payment in full of the Exercise Price and applicable taxes due, the Participant shall be entitled to exercise the Option and receive the number of Shares issuable in connection with the Option exercise. The Shares issued in connection with the Option exercise may be subject to such conditions and restrictions as the Committee may determine, from time to time. The Exercise Price of an Option and applicable withholding taxes relating to an Option exercise may be paid in cash in U.S. Dollars, or by any other method permitted by the Committee in its sole discretion. Additionally, the Committee, in its sole discretion, may provide that an Option may be "net exercised", meaning that upon the exercise of an Option or any portion thereof, the Company shall deliver the greatest number of whole Shares having a Fair Market Value on the date of exercise not in excess of the difference between (x) the aggregate Fair Market Value of the Shares subject to the Option (or the portion of such Option then being exercised) and (y) the sum of (a) the aggregate Exercise Price for all such Shares under the Option (or the portion thereof then being exercised) and (b) the amount of taxes required to be withheld as a result of such exercise, if any, with any fractional share that would result from such equation to be payable in cash.

## SECTION VII

## TERMINATION OR AMENDMENT OF THIS PLAN

**7.1**     *Termination or Amendment*.  The Board may at any time, amend, in whole or in part, any or all of the provisions of this Plan, or suspend or terminate it entirely; provided, however, that, unless otherwise required by law or integrally related to a requirement of law, the rights of a Participant with respect to any Awards granted prior to such amendment, suspension or termination may not be impaired in any material way without the consent of such Participant. In addition, no amendment may be made without first obtaining stockholder approval if such amendment would increase the maximum number of Shares available for issuance as Incentive Stock Options or increase the maximum number of Shares that may be granted to any individual Employee as an Incentive Stock Option, if such approval is required pursuant to applicable requirements of the Code.  Notwithstanding anything in this Plan to the contrary, the Board, in its discretion, may amend the Plan and the Committee, in its discretion, may amend any Award to cause the Plan and such Award to remain beyond the scope of the types of compensatory arrangements that are subject to the requirements of Section 409A of the Code or to otherwise comply with the requirements of Section 409A.

## SECTION VIII

## GENERAL PROVISIONS

**8.1**     *No Right to Continued Employment*.  The adoption of this Plan and the granting of Awards hereunder shall not confer upon any Employee the right to continued employment nor

24252224.4

11

shall it interfere in any way with the right of the Company or any Subsidiary to terminate the employment of any Employee at any time.

**8.2**    *Expenses of the Plan*.  The expenses of the administration of the Plan shall be borne by the Company and its Subsidiaries.

**8.3**    *Non-Transferability of Awards*.  Awards granted under the Plan, and during any period of restriction on transferability, Shares issued in respect of an Award, may not be sold, pledged, hypothecated, assigned, margined or otherwise transferred in any manner other than by will or the laws of descent and distribution, unless and until the Shares to be issued in respect of such Award have been issued, and all restrictions applicable to such Shares have lapsed.  No Award or interest or right therein shall be subject to the debts, contracts or engagements of a Participant or his or her successors in interest or shall be subject to disposition by transfer, alienation, anticipation, pledge, encumbrance, assignment or any other means whether such disposition be voluntary or involuntary or by operation of law, by judgment, lien, levy, attachment, garnishment or any other legal or equitable proceedings (including bankruptcy and divorce), and any attempted disposition thereof shall be null and void, of no effect, and not binding on the Company in any way.  During the lifetime of a Participant, all rights with respect to Awards shall be exercisable only by such Participant, or, if permissible under applicable law, by the Participant's guardian or legal representative.

**8.4**    *Other Plans*.  In no event shall the value of, or income arising from, any Awards issued under this Plan be treated as compensation for purposes of any pension, profit sharing, life insurance, disability or other retirement or welfare benefit plan now maintained or hereafter adopted by the Company or any Subsidiary, unless such plan specifically provides to the contrary.

**8.5**    *Unfunded Plan*.  For purposes of the Employee Retirement Income Security Act of 1974, this Plan is intended to constitute an unfunded plan of incentive compensation, and it is not intended to provide retirement income, to result in a deferral of income for periods extending to the termination of employment or beyond, or to provide welfare benefits.  This Plan shall be unfunded and shall not create (or be construed to create) a trust or a separate fund or funds.  This Plan shall not establish any fiduciary relationship between the Company and any Participant or any other person.  To the extent any person holds any rights by virtue of an Award granted under this Plan, such rights shall be no greater than the rights of an unsecured general creditor of the Company.

**8.6**    *No Rights as a Stockholder*.  A Participant shall not have any rights as a stockholder with respect to Shares which may be deliverable upon exercise of a Stock Option until such Shares have been delivered to him or her.  Without limiting the generality of the foregoing, no Participant holding a Stock Option shall have any information or access rights, voting rights, or rights to receive any dividends or distributions by virtue of such Participant's ownership of such Stock Option. Except as provided in Section 4.3, no adjustment will be made for dividends or other rights for which the record date is prior to the date Shares have been delivered upon exercise of a Stock Option.

12

**8.7**    *Withholding of Taxes*.  The Company and its Subsidiaries shall have the right to deduct from any payment to be made pursuant to this Plan, or to otherwise require, prior to the issuance or delivery of any Shares or the payment of any cash to a Participant, the Participant remit an amount of cash to the Company or the applicable Subsidiary any Federal, state, local or foreign taxes which the Company reasonably believes are required by law to be withheld.  The Committee may permit all or a portion of any such withholding obligation to be satisfied by reducing the number of Shares otherwise deliverable or by accepting the delivery of Shares previously owned by the Participant, which Shares shall be valued at the Fair Market Value on the Exercise Date.  The Company and its Subsidiaries also have the right to withhold from any salary, bonus or any other payment due the Participant the amount necessary to satisfy any tax withholding requirements related to any Award granted under this Plan.  The value of any Shares allowed to be withheld or tendered for tax withholding may not exceed the minimum amount necessary to satisfy the required withholding liability attributable to the taxable event arising from the Award.  The Participant may only request Share withholding in excess of the minimum amount necessary to satisfy required withholding if Participant attests, in such manner as the Committee may require, to the amount of the estimated total tax liability arising from the Award.  It shall be a condition to the obligation of the Company to issue Common Stock upon the exercise of an Option that the Participant pay to the Company, on demand, such amount as may be requested by the Company for the purpose of satisfying any tax withholding liability.  If the amount is not paid, the Company may refuse to issue Shares.

**8.8**    *Requirements of Law*.  The granting of Awards and the issuance of Shares under the Plan shall be subject to all applicable laws, rules, and regulations, and to such approvals by any governmental agencies as may be required.  Notwithstanding any provision of the Plan or any Award Agreement, Participants shall not be entitled to exercise, or receive benefits under, any Award, and the Company shall not be obligated to deliver any Shares or other benefits to a Participant, if such exercise or delivery would constitute a violation by the Participant or the Company of any applicable law or regulation.

**8.9**    *Governing Law*.  This Plan and all actions taken in connection with it shall be governed by the laws of the State of Delaware, without regard to the principles of conflict of laws.

**8.10**   *Liability*.  No Employee of the Company, its Subsidiaries, nor member of the Committee or the Board shall be liable for any action or determination taken or made in good faith with respect to the Plan or any Award granted hereunder and, to the fullest extent permitted by law, all Employees and members of the Committee and the Board shall be indemnified by the Company or its Subsidiaries for any liability and expenses which they may incur through any claim or cause of action arising under or in connection with this Plan or any Awards granted under this Plan.

**8.11**   *Successors*.  All obligations of the Company under this Plan with respect to Awards granted hereunder shall be binding upon any successor to the Company, whether the existence of such successor is the result of a direct or indirect purchase, merger, consolidation, or otherwise, of all or substantially all of the business, stock, and/or assets of the Company.

13

24252224.4

**8.12** *Exemption from, or Compliance with, Section 409A*. For federal income tax purposes, the Plan and the Awards granted hereunder are intended to be either exempt from, or compliant with, Section 409A of the Code. This Plan and all Awards granted hereunder shall be interpreted, operated and administered in a manner consistent with these intentions.

14

24252224.4

DocuSign Envelope ID: 567A8047-FB0A-4F9F-8B65-8C7A7E85AD0E

**AMENDMENT NUMBER ONE TO**
**HALO HEALTH, INC.**
**AMENDED AND RESTATED 2017 EQUITY INCENTIVE PLAN**

This Amendment Number One (this "**Amendment**") to the Halo Health, Inc. Amended and Restated 2017 Equity Incentive Plan, f/k/a the Halo Communications, Inc. Amended and Restated 2017 Equity Incentive Plan, effective as of March 1, 2019 (as may be further amended from time to time, the "**Plan**"), has been adopted by the Board of Directors (the "**Board**") of Halo Health, Inc., a Delaware corporation f/k/a Halo Communications, Inc. (the "**Company**"), and the stockholders of the Company holding at least a majority of the outstanding capital stock of the Company (collectively, the "**Requisite Stockholders**") effective as of February 19 , 2020. All capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan.

**WHEREAS**, pursuant to Section 7.1 of the Plan, the Board and the Requisite Stockholders desire to make certain amendments to the Plan, as set forth herein.

**NOW, THEREFORE**, pursuant to the foregoing, the Plan is amended as follows:

1. **Amendment to Section 4.1 of the Plan**. Section 4.1 of the Plan is hereby amended and restated in its entirety as follows:

    *4.1      Shares Available for Issuance of Awards.  Subject to adjustment as provided in Section 4.3, the aggregate number of Shares which may be issued under this Plan shall not exceed 4,404,737 Shares. As determined from time to time by the Committee, the Shares available under this Plan for grants of Awards may consist either in whole or in part of authorized but unissued Shares or Shares that have been reacquired by the Company following original issuance, subject to the provisions of Section 4.2, below. The maximum number of Shares that may be issued upon the exercise of Incentive Stock Options shall be 4,404,737.*

2. Except as provided for in this Amendment, all other terms and conditions of the Plan shall remain in full force and effect.

26739640.1

E-FILED 05/20/2022 01:12 PM   /   CONFIRMATION 1191909   /   A 2201804   /   COMMON PLEAS DIVISION   /   IFOJ

## HALO HEALTH, INC.

### INCENTIVE STOCK OPTION AWARD AGREEMENT

1.        Grant of Option.  In accordance with and subject to the terms and conditions of (a) the Amended and Restated Doc Halo, Inc. 2017 Equity Incentive Plan, as the same may be amended from time to time (the "Plan") and (b) this Incentive Stock Option Award Agreement (this "Agreement"), Halo Health, Inc., a Delaware corporation, formerly known as Doc Halo, Inc. (the "Company"), grants to the optionee identified in Schedule 1 attached hereto (the "Optionee") an incentive stock option (the "Option"), which is intended to be considered an incentive stock option within the meaning of Section 422 of the Internal Revenue Code of 1986, as amended (the "Code"), to purchase the number of shares (the "Shares") of common stock of the Company (the "Common Stock") set forth in Schedule 1 at the exercise price (the "Exercise Price") per Share set forth in Schedule 1.  The parties acknowledge that the Fair Market Value (as defined in the Plan) of the Shares as of the date of grant set forth in Schedule 1 is $0.38 per share, as determined by the Company's Board of Directors (the "Board") in good faith based on a valuation of the Common Stock by a qualified independent appraiser.  Capitalized terms used but not defined in this Agreement shall have the meanings set forth in the Plan.

2.        Acceptance by Optionee; Execution of Confidentiality Agreement.  The grant of the Option is effective upon approval by the Board; provided, however, the Company shall have the right to terminate the grant of the Option in the event the Optionee fails to  (a) accept the terms and conditions of this Agreement, as evidenced by the Optionee's execution of Schedule 1 to this Agreement and the delivery of an executed copy of such instrument to the Company, or (b) execute a Noncompetition, Confidentiality and Intellectual Property Agreement (the "Confidentiality Agreement") with the Company.   The grant of the Option is made in consideration of the execution of the Confidentiality Agreement and the services to be rendered by the Optionee to the Company or to a subsidiary of the Company (the "Service").

3.        Vesting of Option.  Subject to Sections 4, 5, 6, and 7 hereof, the Option shall vest as set forth in Schedule 1 hereto.

4.        Expiration of Option.  The Option shall expire on the expiration date set forth in Schedule 1 (the "Expiration Date"), unless earlier terminated as set forth in Sections 6 or 7 hereof, and may not be exercised after such date.

5.        Exercise of Option.  Except as otherwise provided in Schedule 1 or Sections 7 hereof, the Optionee may exercise the Option or any portion thereof only after it has become vested (if the Optionee is providing services to the Company at such time).  The Optionee understands and agrees that such an exercisability schedule, depending on the circumstances at the time, may cause all or a portion of the Option to be treated as a non-qualified stock option under the Code.

6.        Forfeiture or Buyout on Breach of Confidentiality Agreement or Separation for Cause.

1

25736649.1

(a)        If the Optionee breaches any provision of the Confidentiality Agreement, or if the Optionee has a separation from Service from the Company within the meaning of such phrase under Section 409A of the Code, as determined by the Company ("Separation from Service") for Cause then, immediately upon notice by the Company to the Optionee of such breach or Separation from Service for Cause, as the case may be, the entire Option (both the vested and unvested portions) shall terminate and shall not be exercisable, and the Company shall have the right, but not the obligation, to purchase from the Optionee any Common Stock

E-FILED 05/20/2022 01:12 PM  /  CONFIRMATION 1191909  /  A 2201804  /  COMMON PLEAS DIVISION  /  IFOJ

shall have the right, but not the obligation, to purchase from the Optionee any Common Stock purchased by the Optionee pursuant to the Option, in accordance with the terms and conditions of that certain Amended and Restated Right of First Refusal and Co-Sale Agreement dated as of March 1, 2019 (the "ROFR Agreement"). The Company must exercise this right by providing written notice thereof to the Optionee on or before the thirtieth (30th) day following the Company's receipt of notice of the Optionee's Separation from Service. The Optionee agrees that the "Appraised Value" as defined in the ROFR Agreement may be the value as determined by the most recent 409A valuation obtained by the Company.

(b)     The Optionee acknowledges and agrees the existence and terms of the Plan and any awards made under the Plan, including the terms of this Agreement, are considered "nonpublic information" under the Confidentiality Agreement, and any disclosure by the Optionee of any of this information to any person (including any employee of the Company) without the express written consent of the Chief Executive Officer of the Company shall be deemed a breach of the Confidentiality Agreement and grounds for forfeiture of the Option under Section 6(a) above.

(c)     Any purchase of Common Stock by the Company pursuant to Section 6(a) shall be closed within twenty (20) days following the Company's exercise of its right to purchase. The Company shall pay the purchase price either (at the Company's option) (A) in cash at closing via certified check or wire transfer of immediately available funds, (B) through an unsecured installment payment arrangement described as follows, or (C) through any combination of options (A) and (B) chosen by the Company. If the installment payment arrangement option is chosen by the Company, installment payments of the portion of the purchase price not paid at closing shall be made not less frequently than in substantially equal quarterly installments over a three (3) year period, with no prepayment penalty. The unpaid portion of the purchase price shall bear simple interest at a rate equal to the rate of interest charged to the Company by its principal bank lender(s) from time to time, or if the Company has no bank lender, the prime rate as reported by the Wall Street Journal. Each quarterly installment payment shall include payment of all accrued and unpaid interest through the date of payment. In the event that, while the Company is making payments under an installment payment arrangement, in the sole discretion of the Company the Company determines that the Optionee commits a new breach of any obligation under the Confidentiality Agreement, any remaining payments owed by the Company under the installment payment arrangement shall be cancelled immediately, the Company shall have no further liability for any payments of the purchase price or interest thereon, and the Company shall be the sole owner of the Shares. The Company's obligations to make installment payments as described above shall be subordinated to amounts due the Company's lenders on terms acceptable to such lenders. At the closing, each party shall

execute any and all documents that are reasonably necessary, as determined by the Company, to carry out the purposes of this <u>Section 6(c)</u>. The Company shall have the right to withhold from the purchase price to be paid any Federal, state, local or foreign taxes which the Company reasonably believes are required by law to be withheld.

       7.    <u>Effect of Separation other than for Cause; Involuntary Transfer</u>.

       (a)    <u>Separation from Service</u>.  If the Optionee's employment with the Company is terminated for any reason other than for Cause (including, without limitation, termination of the service relationship by the Company without Cause, voluntary termination by the Optionee, or as a result of the death or Disability of the Optionee), then the unvested portion of the Option shall immediately terminate on such date, and the vested portion of the Option shall, notwithstanding the limitations on exercisability provided for in <u>Section 5</u>, become exercisable by the Optionee or the Optionee's estate for a period of (i) thirty (30) days from the date of Separation from Service for any reason other than for Cause or as a result of the death or Disability of the Optionee or (ii) one (1) year from the date of Separation from Service in the case of death or Disability of the Optionee.  At the conclusion of this thirty (30) day or one (1) year period, as applicable, the Option (if not yet exercised) shall terminate in its entirety and shall no longer be exercisable under any circumstances.  Common Stock purchased pursuant to the Option shall be subject to the terms of the Amended and Restated Bylaws of the Company and the Amended and Restated Voting Agreement dated March 1, 2019, the Amended and Restated Right of First Refusal and Co-Sale Agreement dated March 1, 2019 and the Amended and Restated Investors' Rights Agreement dated March 1, 2019, as may be amended from time to time (collectively, the "<u>Investor Documents</u>").

       Upon the Optionee's Separation of Service with the Company for any reason other than Cause, including death or Disability, the Company shall have the right, but not the obligation, to acquire some or all of the Shares owned or purchased by such Optionee or his or her estate, in accordance with the terms and conditions of the ROFR Agreement. The Optionee agrees that the "Appraised Value" as defined in the ROFR Agreement may be the value as determined by the most recent 409A valuation obtained by the Company.

       (b)    <u>Effect of Other Involuntary Transfer of Options</u>. If, notwithstanding the restrictions on transfer applicable to the Option, a court of competent jurisdiction orders that all or any portion of the Option be transferred to a third party (for example, in the context of a divorce decree), then any vested and unvested portions of the Options ordered to be so transferred shall immediately terminate.

       8.    <u>Procedure for Exercise</u>. The Option may be exercised for the number of Shares specified in a written notice delivered to the Company at least ten (10) days before the date on which purchase is requested, accompanied by payment of the aggregate Exercise Price in cash, or, with the consent of the Committee in its sole discretion, delivery of Shares previously owned by the Optionee, acceptance of such other consideration as is acceptable to the Committee, or reducing the number of Shares otherwise deliverable as a result of exercise. If upon exercise of all or a portion of the Option tax withholding by the Company is required, then, at the

3

25736649.1

E-FILED 05/20/2022 01:12 PM  /  CONFIRMATION 1191909  /  A 2201804  /  COMMON PLEAS DIVISION  /  IFOJ

Committee's discretion and as a condition to such exercise, the Committee may satisfy such tax obligation by reducing the number of Shares otherwise deliverable or by accepting the delivery of Shares previously owned by the Optionee. The Company shall also have the right to withhold from any salary, bonus, or other payment due the Optionee the amount necessary to satisfy any tax withholding requirements related to the Option, provided, however, that the Optionee shall be solely responsible for all federal, state and foreign taxes applicable to Optionee's receipt of the Option, exercise of the Option and ownership of the Shares.

9.      Non-Transferability of Stock Option.   The Option granted hereunder to the Optionee shall not be transferable by the Optionee and the Optionee may not assign all or any portion of this Option.

10.     Condition of Granting Award: Execution of the Confidentiality Agreement.   The Optionee understands that, as a condition to the Company granting the rights under this Option, the Optionee must execute and deliver a Confidentiality Agreement with the Company. Optionee agrees that the Optionee is acquiring the Option solely for its own account for investment purposes only and not for the account of any other person and not for distribution, assignment, or resale to others, and no other person has a direct or indirect beneficial interest in the Option. The Optionee hereby represents and warrants that the Optionee is aware of the Company's business affairs and financial condition and has acquired sufficient information about the Company through its business relationship with the Company to reach an informed and knowledgeable decision regarding its receipt of the Option and to protect its own interests in connection with this transaction.

11.     Condition of Delivery of the Shares Upon Exercise.   The Optionee agrees that, in connection with his or her future purchase of Common Stock, the Optionee must execute and deliver (i) a representation letter in the form attached hereto as Exhibit 1, containing representations, warranties, and certifications to the Company, and (ii) an agreement in writing to be bound by the Investor Documents, as may be amended from time to time, or any successor agreement covering similar subject matter. The Optionee acknowledges that the terms, conditions and restrictions of the Investor Documents are subject to change from time to time without notice to the Optionee.

12.     Incentive Stock Option Treatment Subject to Certain Conditions and Limitations; Taxes.   The Optionee acknowledges that the Option's treatment as an incentive stock option within the meaning of the Code is subject to certain conditions and limitations. Failure to meet any of these conditions or to abide by any of these limitations will cause the Option to be treated as a non-qualified stock option under the Code. The Optionee understands that the Optionee will be responsible for any and all taxes payable by the Optionee as a result of the grant of the Option or the vesting or exercise thereof.

13.     Market Standoff Period.   The Optionee hereby acknowledges and agrees that if so requested in connection with any registration of the offering of any securities of the Company (or any successor) under the Securities Act, the Optionee shall not pledge, lend, sell or otherwise transfer any Shares or other securities of the Company (or a successor) during the 180-day period

4

25736649.1

(or such other period as may be requested in writing) (the "Market Standoff Period") following the effective date of a registration statement of the Company (or any successor), any parent corporation (as defined in Section 424 of the Code), or any subsidiary filed under the Securities Act. To enforce this restriction, such entity may impose stop-transfer instructions with respect to securities subject to the foregoing restrictions until the end of such Market Standoff Period.

14.     No Right to Continued Service. Nothing contained in the Plan or in this Agreement, nor any action taken by the Committee, shall confer upon the Optionee any right with respect to the continuation of Service with the Company as a consultant, employee or otherwise, nor will it interfere in any way with the right of the Company to terminate the Optionee's service relationship with the Company at any time with or without Cause.

15.     Compliance with Applicable Law. The issuance of the Shares pursuant to the exercise of the Option is subject to compliance with all applicable laws. This Agreement shall be construed in accordance with and governed by the laws of the State of Delaware, other than its laws relating to choice of law, and the federal laws of the United States.

16.     Incorporation of Plan Provisions. This Agreement is made pursuant to the provisions of the Plan and is subject to all the terms and conditions of the Plan as if the same were fully set forth in this Agreement. The Optionee hereby acknowledges that he has received, read, and understood the copy of the Plan delivered or made available to him. If there is a conflict between the provisions of the Plan and the provisions of this Agreement, the provisions of the Plan shall govern, except where the Plan states that an Award Agreement may otherwise provide. The Committee retains all authority and powers granted by the Plan, as it may be amended from time to time, that are not expressly limited by this Agreement, including, but not limited to, the sole and absolute right to interpret the provisions of the Plan and this Agreement.

17.     Miscellaneous. This Agreement shall be binding upon and inure to the benefit of all successors of the Company. Except as otherwise provided in the Plan, this Agreement may not be amended without the express written consent of both parties hereto.

18.     Notice. Notices to the Company may be personally delivered or mailed to the Secretary of the Company at the Company's principal office. Notices to the Optionee may be personally delivered or mailed to the Optionee's last mailing address of record according to the Company's records.

19.     Survival of Agreement. To the extent necessary to carry out the intentions of the parties hereto, the respective rights and obligations of the parties hereunder shall survive any termination of this Agreement.

20.     Entire Agreement. This Agreement, together with any other documents explicitly incorporated herein by reference and any other separate subscription agreement or award agreement executed by the Optionee and the Company (but excluding any employment agreements, offer letters, email correspondence, oral conversations or proposals), constitutes the sole and entire agreement of the parties with respect to the award of equity to the Optionee in

25736649.1

exchange for Optionee's Service to the Company, and supersedes all prior and contemporaneous understandings, agreements, representations and warranties, both written and oral, with respect to such subject matter.

[*Signatures on Next Page*]

6

25736649.1

E-FILED 05/20/2022 01:12 PM   /   CONFIRMATION 1191909   /   A 2201804   /   COMMON PLEAS DIVISION   /   IFOJ

**IN WITNESS WHEREOF**, the Company and the Optionee have caused this Agreement to be executed as of the date set forth on <u>Schedule 1</u> to this Agreement.

HALO HEALTH, INC.                    OPTIONEE:


By:
Name: Jose Barreau                    Name: STEPHEN GRYGLAS
Title: Chief Executive Officer                    Date:
Date:

[SIGNATURE PAGE TO STOCK OPTION AWARD AGREEMENT]

## Schedule 1

### Incentive Stock Option Award Agreement

| | |
|---|---|
| Name of Optionee: | STEPHEN GRYGLAS |
| Number of Shares: | 220,244 |
| Exercise Price per Share: | $0.38 |
| Date of Grant: | January 30th, 2020 |
| Vesting Commencement Date: | November 5th, 2019 |
| Expiration Date: | Ten (10) years from the Date of Grant |
| Vesting Schedule: | Subject to forfeiture or acceleration in accordance with Sections 6 and 7 of the Agreement, the Options shall vest as follows: |

*Twenty-five percent (25%) of the Option shall vest upon the one-year anniversary of the Vesting Commencement Date (the "Initial Vesting Date"). The remainder of the shares subject to the Option (the "Remainder Shares") shall vest monthly in equal one thirty-sixth (1/36th) increments on each one-month anniversary of the Initial Vesting Date, until all of the Remainder Shares subject to the Option have vested on the three (3) year anniversary of the Initial Vesting Date, subject, at all times, however, to the Optionee's continued service to the Company as provided in the Agreement.*

Once vested, the Option shall be exercisable only in accordance with the Agreement. Upon a "Change of Control" as defined in Section 2.7 of the Plan, Optionee's unvested portion of Incentive Stock Options shall become fully vested.

The undersigned agrees to the terms and conditions of the Plan and Agreement of which this Schedule 1 is a part.

HALO HEALTH, INC.                              OPTIONEE:

By:

25736649.1

Name: Jose Barreau                              Name: STEPHEN GRYGLAS
Title: Chief Executive Officer                  Date:
Date:

25736649.1

E-FILED 05/20/2022 01:12 PM   /   CONFIRMATION 1191909   /   A 2201804   /   COMMON PLEAS DIVISION   /   IFOJ

**Exhibit 1**

**INCENTIVE STOCK OPTION AWARD AGREEMENT REPRESENTATION LETTER**

Ladies and Gentlemen:

In connection with the receipt of 220,244 shares of Common Stock of the Company of Halo Health, Inc., a Delaware corporation, formerly known as Doc Halo, Inc. (the "Company"), by the undersigned (the "Recipient") pursuant to that certain Incentive Stock Option Award Agreement by and between the Recipient and the Company dated as of September 9th, 2019 (the "Award Agreement"), which incorporates that certain Amended and Restated Doc Halo, Inc. 2017 Equity Incentive Plan, as the same may be amended from time to time (the "Plan"), the Recipient hereby acknowledges, represents, warrants, and certifies that:

A.    Investment. The Recipient has been informed that the shares of common stock of the Company to be issued to it pursuant to the Award Agreement (the "Shares") have not been registered under the Securities Act of 1933, as amended (the "Act"), and accordingly must be held indefinitely unless such Shares are subsequently registered under the Act or an exemption from such registration is available.

B.    Acquisition for Own Account. The Recipient is receiving the Shares solely for its own account for investment purposes only and not for the account of any other person and not for distribution, assignment, or resale to others, and no other person has a direct or indirect beneficial interest in the Shares.

C.    Ability to Protect the Recipient's Own Interests and Bear Economic Risks. The Recipient's financial situation is such that it can afford to bear the economic risk of holding the Shares for an indefinite period of time, it has no need for liquidity with respect to its investment and has adequate means to provide for its current needs and contingencies, and can afford to suffer the complete loss of its investment in the Shares.

D.    Access to Information. The Recipient is aware of the Company's business affairs and financial condition and has acquired sufficient information about the Company to reach an informed and knowledgeable decision to acquire the Shares.

E.    Restricted Securities.

(i)    The Recipient understands that the Shares will be characterized as "restricted securities" under the federal securities laws inasmuch as they are being acquired from the Company in a transaction not involving a public offering and that under such laws such Shares may be resold without registration under the Act only in certain limited circumstances.

(ii)    The Recipient acknowledges that the Shares must be held indefinitely unless subsequently registered under the Act and applicable state securities laws or an exemption from such registration is available. The Recipient understands that the Company is under no obligation to register the Shares.

25736649.1

E-FILED 05/20/2022 01:12 PM   /   CONFIRMATION 1191909   /   A 2201804   /   COMMON PLEAS DIVISION   /   IFOJ

(iii)    The Recipient is aware of the provisions of Rule 144 under the Act which permit limited resale of securities purchased in a private placement.

F.    No Public Market.  The Recipient understands that no public market now exists for any of the securities issued by the Company and that the Company has not made any assurances that a public market will ever exist for the Shares.

G.    Restrictions in Investor Documents.  The Recipient understands that the Investor Documents (as defined below) contain restrictions relating to the voting and transferability of the Shares.  The Recipient has received, read, and understood the copies of the Amended and Restated Bylaws of the Company, the Amended and Restated Voting Agreement dated March 1, 2019, the Amended and Restated Right of First Refusal and Co-Sale Agreement dated March 1, 2019, and the Amended and Restated Investors' Rights Agreement dated March 1, 2019, (collectively, the "Investor Documents") which have been delivered or made available to the Recipient, and the Recipient agrees to be bound by the terms of the Investor Documents.  The Recipient understands and agrees that the Shares will be subject to the restrictions set forth in the Investor Documents, as the same may be amended or modified in accordance with its terms.

In view of these representations, warranties, and certifications, the Recipient agrees that, in the event such Shares are certificated, there may be affixed to the certificates for the Shares to be issued to it, and to all certificates issued hereafter representing such Shares (until in the opinion of counsel, which opinion must be reasonably satisfactory in form and substance to counsel for the Company, it is no longer necessary or required) a legend substantially as follows:

"THE SHARES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY STATE SECURITIES LAWS, AND MAY BE TRANSFERRED ONLY PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR AN EXEMPTION FROM REGISTRATION THEREUNDER.

THE SHARES REPRESENTED BY THIS CERTIFICATE AND THEIR TRANSFER ARE RESTRICTED BY AND SUBJECT TO THE TERMS OF THE COMPANY'S AMENDED AND RESTATED BYLAWS AND ANY ADDITIONAL INVESTOR DOCUMENTS, TO WHICH THE CORPORATION IS A PARTY AND THAT IS ON FILE AT THE OFFICES OF THE CORPORATION.  THE CORPORATION WILL SEND A COPY OF THE AGREEMENTS TO ANY STOCKHOLDER WITHOUT CHARGE WITHIN FIVE (5) DAYS AFTER RECEIPT OF A WRITTEN REQUEST THEREFORE."

The Recipient further agrees that the Company may prohibit the transfer of such Shares, so long as the legend remains on the certificates representing the Shares.

Very truly yours,

_____
Name: STEPHEN GRYGLAS

25736649.1

Date: _____

25736649.1

E-FILED 05/20/2022 01:12 PM   /   CONFIRMATION 1191909   /   A 2201804   /   COMMON PLEAS DIVISION   /   IFOJ

## NOTICE OF EXERCISE

**Halo Health, Inc.**
**1 West 4ᵗʰ Street, Suite 1000**
**Cincinnati, OH 45202**                                    Date of Exercise: _____

Ladies and Gentlemen:

This constitutes notice under my stock option that I elect to purchase the number of shares for the price set forth below.

Type of option (check one):        Incentive ☐        Nonstatutory ☐

Stock option dated:                _____

Number of shares as                _____
to which option is
exercised:

Certificates to be                 _____
issued in name of:

Total exercise price:          $_____

Cash payment delivered         $_____
herewith:

By this exercise, I agree (i) to provide such additional documents as you may require pursuant to the terms of the **Halo Health, Inc. Amended and Restated 2017 Equity Incentive Plan** (ii) to provide for the payment by me to you (in the manner designated by you) of your withholding obligation, if any, relating to the exercise of this option, and (iii) if this exercise relates to an incentive stock option, to notify you in writing within fifteen (15) days after the date of any disposition of any of the shares of Common Stock issued upon exercise of this option that occurs within two (2) years after the date of grant of this option or within one (1) year after such shares of Common Stock are issued upon exercise of this option.

I hereby make the following certifications and representations with respect to the number of shares of Common Stock of the Company listed above (the "***Shares***"), which are being acquired by me for my own account upon exercise of the Option as set forth above:

I acknowledge that the Shares have not been registered under the Securities Act of 1933, as amended (the "***Securities Act***"), and are deemed to constitute "restricted securities" under Rule 701 and Rule 144 promulgated under the Securities Act. I warrant and represent to the Company that I have no present intention of distributing or selling said Shares, except as permitted under the Securities Act and any applicable state securities laws.

1.

I further acknowledge that I will not be able to resell the Shares for at least ninety days (90) after the stock of the Company becomes publicly traded (*i.e.,* subject to the reporting requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934) under Rule 701 and that more restrictive conditions apply to affiliates of the Company under Rule 144.

I further acknowledge that all certificates representing any of the Shares subject to the provisions of the Option shall have endorsed thereon appropriate legends reflecting the foregoing

limitations, as well as any legends reflecting restrictions pursuant to the Company's Articles of Incorporation, Bylaws and/or applicable securities laws.

I further agree that, if required by the Company (or a representative of the underwriters) in connection with the first underwritten registration of the offering of any securities of the Company under the Securities Act, I will not sell, dispose of, transfer, make any short sale of, grant any option for the purchase of, or enter into any hedging or similar transaction with the same economic effect as a sale, any shares of Common Stock or other securities of the Company for a period of one hundred eighty (180) days following the effective date of a registration statement of the Company filed under the Securities Act or such longer period as necessary to permit compliance with NASD Rule 2711 or NYSE Member Rule 472 and similar rules and regulations (the "***Lock-Up Period***").   I further agree to execute and deliver such other agreements as may be reasonably requested by the Company and/or the underwriter(s) that are consistent with the foregoing or that are necessary to give further effect thereto.   In order to enforce the foregoing covenant, the Company may impose stoptransfer instructions with respect to securities subject to the foregoing restrictions until the end of such period.

Very truly yours,

2.